IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                No. CR 06-1453 MCA

JAIME PORTILLO-PORTILLO,

        Defendant.

## MEMORANDUM OPINION AND ORDER
## DENYING DEFENDANT'S MOTION TO SUPPRESS

**THIS MATTER** comes before the Court on Defendant Jaime Portillo-Portillo's *Motion to Suppress Evidence and Statements* [Doc. 22] filed on September 8, 2006. The Court held evidentiary hearings on Defendant's motion in Albuquerque, New Mexico, on October 3, 2006, and October 6, 2006, after which the parties were afforded the opportunity to file supplemental briefs. Having fully considered the parties' submissions, the applicable law, the evidence and the arguments of counsel presented at the hearings, and being fully advised in the premises, the Court denies Defendant's motion based upon the findings of fact and conclusions of law set forth below.

## I.    FINDINGS OF FACT

1.    United States Border Patrol Agents Guzman and Miranda were on duty patrolling the City of Deming, New Mexico, in uniform with their marked Border Patrol vehicle between approximately 2:00 p.m. and 10:00 p.m. on or about April 23, 2006.

2.      The City of Deming is located in the southwestern region of the State of New Mexico approximately 35 miles north of the border between the United States and Mexico, along major highway and railroad routes.

3.      Agents Guzman has nine years of experience working for the Border Patrol and is responsible for apprehending large volumes of illegal alien traffic in the Deming area; for example, Agent Guzman testified that he has made between 400 and 600 arrests between April 23, 2006, and the date of the suppression hearing on October 3, 2006, and thousands of arrests before that period.

4.      Agent Miranda is a Border Patrol agent in training with only about four months of on-the-job experience in Deming as of April 23, 2006.

5.      While on routine patrol in the City of Deming at approximately 4:00 p.m. that day, Agents Guzman and Miranda observed a large group of people congregating on Pine Street.

6.      When the agents drove west on Pine Street in their marked Border Patrol vehicle and approached the group, the people in that group all ran north on foot.

7.      The agents pursued the group in their vehicle by driving around the block and down an alley near a Burger King restaurant.

8.      As the agents drove down the alley, they saw many people from the group sitting down near an abandoned house; as the officers approached, these people rose from their seats and ran away in all directions.

-2-

9.     Some of the people in this group ran in the direction of the El Mirador hotel, which is located about three or four blocks away from the Burger King restaurant referenced above.

10.     The agents continued their pursuit of the group of people they had observed running away and eventually apprehended about six to twelve of them.

11.     All of the people whom the agents initially apprehended in that pursuit were unable to provide evidence that they were in the United States legally, and hence the agents took them to the Border Patrol station for processing to determine their identities and immigration status.

12.     Agents Guzman and Miranda were not involved in processing the persons they apprehended that day, and thus their delivery of the suspects to the Border Patrol station took only about five to ten minutes; after that time, they resumed their patrol in the City of Deming.

13.     During the time that the agents were looking for the suspects who fled from the area near the Burger King restaurant earlier that day, they had occasion to patrol the El Mirador hotel.

14.     Agent Guzman's interest in checking the El Mirador hotel was prompted by the fact that he and Agent Miranda observed some of the suspects running in the general direction of that hotel a short time earlier, and by his prior knowledge that there were two particular hotel rooms there which were frequently used as a way station by undocumented aliens.

15.     Agent Guzman explained that the El Mirador hotel consists of two wings of hotel rooms arranged in an "L" shape; the two rooms favored by undocumented aliens are located at the corner where the two wings meet, at which there is also a small walled courtyard area that is partially covered from view by vegetation growing on trellises and walls.

16.     Agent Guzman further explained that unlike the doors to the other hotel rooms, which face an open parking lot adjoining a public street across from a restaurant, the doors to the two particular rooms favored by undocumented aliens face the courtyard and are not readily observable from the street.

17.     In addition, there are one or more ladders that are typically placed in the adjacent courtyard area which allow people to discreetly escape from the two hotel rooms in question, scale the wall, and flee into the adjoining alley or side street without appearing in the hotel's open parking lot or the main street in front of the hotel.

18.     At the time the agents patrolled the El Mirador Hotel on the afternoon or early evening of April 23, 2006, the ladder in the courtyard was leaning against the wall leading to the alleyway or side street in the typical fashion used by undocumented aliens to enter and exit the adjacent hotel rooms without being seen from the hotel's parking lot or the main street in front of the hotel.

19.     Agent Guzman's first action when he arrived at the hotel at that time was to ask the hotel's desk clerk whether anyone was occupying the two rooms that the agent knew to be favored by undocumented aliens.

20.     The desk clerk responded by showing Agent Guzman the registration card for one of the rooms, which listed only one first and last name, and had no other information on it; Agent Guzman could not recall whose name appeared on the registration card, and no evidence was presented as to whose name was on the card.

21.     Defendant presented no evidence that it was his name ("Jaime Portillo-Portillo") which appeared on the registration card, that he paid any portion of the rental charge for the room, that he had a key to the room, that he had any future plans to stay in the room overnight, or that the hotel rented the room at a double-occupancy rate or issued two keys.

22.     Agent Guzman testified that based on his experience, hotel registration cards typically contain, in addition to the names of the registered guests, an address, city, zip code, and information about a hotel guest's vehicle such as a license-plate number.

23.     Agent Guzman also testified that based on his experience, undocumented aliens with no identification papers typically fail to list anything on the registration card except their names.

24.     After viewing the registration card, Agent Guzman asked the desk clerk if it was O.K. for him to go up to the room in question, and she agreed.  He then went to the room and knocked on the door.

25.     During the entire course of events that followed, Agent Miranda never entered the hotel room or stood at its doorway.  Rather, Agent Miranda remained in the parking area outside the hotel to keep watch on the Border Patrol agents's vehicle, which was parked at

that location and which contained other suspects that the agents already had taken into custody during their patrol.

26.     While Agent Miranda was watching the suspects in the Border Patrol vehicle, Agent Guzman went to the hotel room in question and knocked on the door as he stood outside in an open area exposed to the view of the hotel occupants and hotel staff.

27.     Neither agent issued any commands or made any showing of official authority directing the occupants to come out of the hotel room, nor did the agents use subterfuge or misrepresentation to induce the occupants of the hotel room to open the door.

28.     At the time Agent Guzman knocked on the door, Defendant and one other person, Mr. Eduardo Rodriguez-Garcia, were inside the hotel room eating and watching television while seated on the hotel beds without their shirts or shoes on.

29.     At the suppression hearing, Mr. Rodriguez testified that he and his "companion" stayed in the hotel room the previous night, that he paid for another night at the hotel room at approximately 12:00 noon that day, and that the Border Patrol agents showed up and knocked on the hotel-room door about one-half hour later.

30.     Mr. Rodriguez's testimony conflicts with Agent Guzman's testimony as to the time of day when the agents arrived at the hotel, because Agent Guzman testified that the agents did not even begin their shift until about 2:00 p.m. on April 23, 2006, and the earlier encounter with the group of suspects near the Burger King restaurant did not occur until about 4:00 p.m.

31.     At the suppression hearing, Mr. Rodriguez referred to the other occupant of the hotel room as his "companion" but never identified Defendant by name or gave any details about their relationship with one another.

32.     Mr. Rodriguez further testified that he was not planning to stay in Deming, but was merely resting at the hotel while "trying to find a means to go further on";  he provided no details about whether Defendant shared these plans or had a different itinerary.

33.     In response to Agent Guzman's knock on the door of the hotel room, Mr. Rodriguez voluntarily opened the door and stood at the threshold of the doorway, thereby allowing Agent Guzman to see him as well as Defendant, who was seated on a bed a short distance away from the door.

34.     Agent Guzman initially addressed Mr. Rodriguez in English, but upon hearing him respond in broken English, Agent Guzman quickly switched to the Spanish language and continued the rest of his conversation with the hotel occupants in Spanish.

35.     After identifying himself and explaining that he was there because he was looking for the people who ran away from him, Agent Guzman initially asked Mr. Rodriguez whether he was a United States Citizen and whether he had any identification.

36.     Mr. Rodriguez initially stated that he was a United States citizen but that he did not have any identification papers.

37.     Agent Guzman noticed that Mr. Rodriguez appeared nervous when answering the above questions.

38.     According to Agent Guzman, he then asked if Mr. Rodriguez was making any false statements and advised him that charges could be filed against him if he falsely stated that he was a United States citizen.

39.     Agent Guzman testified that in response to this follow-up question, Mr. Rodriguez immediately recanted by admitting that he was a citizen of Mexico and that he did not have any documents to be in the United States legally.

40.     At the suppression hearing, Mr. Rodriguez denied recanting in this manner but admitted he had no documentation to show Agent Guzman that his presence in the United States was lawful.

41.     The respective testimony of the Border Patrol agents and Mr. Rodriguez diverges as to what happened next after the initial conversation at the threshold of the doorway:  according to Mr. Rodriguez, Agent Guzman entered the hotel room and walked to the bathroom to check if anyone else was hiding there, but according to the Border Patrol agents, Agent Guzman's entry into the hotel room did not occur until after he had questioned both Mr. Rodriguez and Defendant from the vantage point of the doorway and the two men exited the hotel room.

42.     Regardless of when Agent Guzman entered the hotel room for the purpose of checking the bathroom, it is clear that he did not find any incriminating evidence or additional persons in the bathroom, in the closet, underneath the bed, or in any other place where he looked during his brief search of the room; the agent already observed Defendant and Mr. Rodriguez from the open doorway before entering the hotel room.

43.     Mr. Rodriguez's testimony about what happened after Agent Guzman entered the hotel room is not entirely clear.  At one point during his testimony, he stated that he stepped out of the hotel room as the agent was entering it, but other portions of his testimony indicate that he remained in the room for a brief period getting dressed and gathering some papers, then left the room with the agent when the agent finished checking the bathroom.

44.     In his testimony, Mr. Rodriguez-Garcia also equivocated about the manner in which he left the hotel room:  at one point, his testimony indicates that Agent Guzman simply *told* him to get up and go outside to smoke a cigarette after he finished dressing and gathering his papers, but at another point his testimony indicates that the agent  actually *took* him outside the hotel room.

45.     In any event, Agent Guzman did not contact or speak to Defendant while the agent was inside the hotel room or when he prompted Mr. Rodriguez to leave the room; rather, Mr. Rodriguez's testimony indicates that during this period, Defendant remained in the room getting dressed, the agent said nothing to Defendant, and then the agent left the room with Mr. Rodriguez in order to knock on the door of another hotel room while Mr. Rodriguez smoked a cigarette.

46.     When both Agent Guzman and Mr. Rodriguez were outside the hotel room, the agent eventually turned his attention to Defendant for the first time while Defendant remained unrestrained in plain view from the open doorway.

47.      Speaking in the Spanish language from the threshold of the open doorway, Agent Guzman asked Defendant whether he was a United States citizen, and without

hesitation Defendant responded in Spanish that he is a citizen of Mexico and is present in the United States illegally.

48.     After Defendant provided this response and finished dressing, Agent Guzman asked him to exit the hotel room; this request was not accompanied by any show of force by the Border Patrol agents.

49.     Defendant complied with the agent's request to exit the hotel room and was then placed under arrest by the Border Patrol agents outside the hotel room.

50.     The Border Patrol agents did not take Defendant into custody, handcuff him, or place him in the Border Patrol vehicle until after he responded to Agent Guzman's initial questioning, finished dressing, and walked out of the hotel room.

51.     Before and during Agent Guzman's initial conversations with Defendant and Mr. Rodriguez concerning their identities and citizenship, the Border Patrol agents did not brandish their weapons, make any physical contact with Defendant, gain entry to the hotel room by means of physical force, issue commands or make statements to Defendant suggesting that his compliance with their requests was compulsory, or retain any of Defendant's personal effects.

52.     After the two occupants of the hotel room were arrested and Agent Guzman completed his brief search of the room, the Border Patrol agents transported both men to the Border Patrol station where they were handed over to processing agents for fingerprinting in accordance with standard booking procedures.

53.     Agent Guzman testified that all of the other suspects apprehended that day were turned over for processing in the same manner.

54.     The only information Agents Guzman and Miranda gave to the processing agents was a brief synopsis of what happened to the group of people they apprehended that day, which did not include details about oral statements the suspects made or which suspects were apprehended at the hotel as opposed to other locations; hence, those details do not appear on the processing agent's report or in the agents' arrest logs.

55.     As a result of the fingerprinting undertaken by the processing agent in accordance with standard booking procedures, the Border Patrol ascertained Defendant's identity, retrieved his A-file, and learned that he has a prior aggravated felony conviction and was previously deported from the United States.

56.     The Border Patrol agents did not rely on any information retrieved from Agent Guzman's questioning of Defendant or his brief entry and search of the hotel room in order to determine Defendant's identity, retrieve his A-file, and learn of the above information; indeed, the processing agent did not even know that such a search occurred, where exactly Defendant was taken into custody, or what oral statements he made to the other agents.

57.     Neither Mr. Rodriguez nor the Border Patrol agents provided any testimony from which the Court can reasonably infer that Defendant paid to stay in the hotel room on April 23, 2006, was a registered guest of the hotel on that date, had a key to the hotel room, planned to stay in the hotel room another night, or had a pre-existing relationship with Mr.

Rodriguez that would provide him with a reasonable expectation of privacy in the hotel room based on Mr. Rodriguez-Garcia's payment for the room.

58.     Based on the totality of the circumstances known to the Border Patrol agents when they first approached the hotel room Defendant was occupying, they had a reasonable suspicion that the hotel room was harboring undocumented aliens; this reasonable suspicion was not dispelled at any time after they knocked on the door and spoke to the room's occupants.

59.     Based on the totality of the circumstances, Agent Guzman's initial actions in knocking on the door, speaking to Mr. Rodriguez when he opened the door and stood in the threshold, observing from the vantage point of the doorway that Defendant was in the hotel room, and questioning Defendant about the lawfulness of his presence in the United States were part of a consensual encounter.

60.     Defendant does not have a reasonable expectation of privacy that would entitle him to challenge the agents' encounter with Mr. Rodriguez, and therefore any incriminating evidence obtained as a result of the agents' interaction with Mr. Rodriguez is not subject to the exclusionary rule in this case.

61.     During the initial questioning which occurred during the consensual encounter with Defendant before he was taken into custody or subjected to any actual or threatened use of force, Defendant readily admitted that he was in the United States illegally and produced no documentation to suggest otherwise, thereby providing the agents with probable cause to arrest him.

62.     Under the totality of the circumstances, Defendant was not in the custody of the Border Patrol agents at the time he made these admissions, and therefore the requirements of <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), and its progeny do not apply at that juncture.

63.     The agent's brief entry and search of the hotel room played no causal role in the development of probable cause for this arrest, because neither Defendant nor any incriminating evidence were found or seized as a result of this brief entry and search, and the agent did not address or contact Defendant in any way while inside the hotel room.

64.     Defendant has not shown that he had a personal, subjective expectation of privacy in the hotel room that the law would recognize as reasonable at the time the Border Patrol agents entered.

65.     Under the totality of the circumstances, it was not unreasonable for Agent Guzman to enter the hotel room through the open doorway, because Defendant already was in plain view before the agent entered, there were exigent circumstances necessitating an immediate entry into the hotel room to prevent Defendant and other possible suspects from fleeing the scene, and the agents did not themselves deliberately create those exigent circumstances as a ruse to avoid the need for a warrant.

66.     The fingerprinting and computer analysis undertaken by the processing agents at the Border Patrol station after Defendant's arrest was conducted as part of a standard booking procedure for the purpose of accurately determining Defendant's identity and not

as the purposeful exploitation of any illegality in effecting Defendant's arrest, entering the hotel room, or eliciting statements from him.

67.    The Border Patrol agents' discovery of Defendant's fingerprints and A-file, as well as their computer analysis regarding those items, are not tainted by any violation of the Fourth Amendment or the requirements of <u>Miranda</u> and its progeny.

## II.    <u>LEGAL ANALYSIS AND CONCLUSIONS OF LAW</u>

Defendant's motion to suppress contends that he was seized and interrogated by Border Patrol agents in violation of his Fourth Amendment rights and his rights under <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).  These contentions require the Court to determine: (1) the extent to which Defendant has reasonable expectations of privacy on which he can base a challenge to a search or seizure conducted by the Border Patrol agents; (2) when Defendant was "seized" within the meaning of the Fourth Amendment and taken into custody for <u>Miranda</u> purposes; (3) whether the Border Patrol agents met the necessary requirements to justify a warrantless seizure at that moment; (4) whether the Border Patrol agents subjected Defendant to any custodial interrogation before he was given the required <u>Miranda</u> warnings; and (5) whether the evidence of Defendant's identity obtained through the Border Patrol's fingerprinting and computer analysis is tainted by any violation of the Fourth Amendment or <u>Miranda</u> requirements.  I gave the parties additional notice and opportunity for supplemental briefing on some of these issues because the facts revealed at the suppression hearing differ significantly in some respects from those anticipated in the parties' initial motion papers.

I first address the scope and reasonableness of Defendant's expectations of privacy and then turn to the analysis of the timing of the seizure.  Upon fixing the moment when Defendant was seized, I proceed to analyze whether the Border Patrol agents' detention of Defendant was justified by reasonable suspicion and probable cause to believe that his presence in the United States was illegal and whether there were exigent circumstances requiring an immediate arrest in order to prevent Defendant's escape.  My analysis of the timing and justification for the seizure also answers the question whether Agent Guzman's initial conversation with Defendant occurred before or after he was taken into custody and provided with Miranda warnings.

I conclude from this analysis that Defendant was not seized within the meaning of the Fourth Amendment until after the following events occurred:  (1) the other occupant of the hotel room opened the door (thereby revealing the interior of the hotel room where Defendant was in plain view), (2) the two occupants failed to produce any documentation of their identity or immigration status, (3) the two occupants responded to the agents' questioning by indicating that they were in the United States illegally, and (4) the two occupants exited the hotel room.  Combined with the agents' knowledge of the events which transpired earlier that day and the prior use of that particular hotel room as a way station for undocumented aliens, these circumstances provided the agents with probable cause and exigent circumstances to detain Defendant at the hotel room based on his immigration status.  Because the agent's initial questioning of Defendant occurred before he was taken into custody, no other incriminating evidence was obtained as a result of the agent's brief search

of the hotel room, and the subsequent processing was performed by other Border Patrol agents without knowledge of the circumstances of this particular Defendant's arrest, the fingerprinting and other research leading to the discovery of Defendant's identity as an illegal alien with a prior felony conviction is untainted by any violation of the Fourth Amendment or <u>Miranda</u> requirements.

### A.    Defendant's Expectations of Privacy

The Fourth Amendment to the United States Constitution protects Defendant's right to be secure in his person and effects against unreasonable searches and seizures while he is present within the United States.  Defendant has Fourth Amendment standing[1] to challenge the seizure of his person regardless of whether he had any property interest in the hotel room he was occupying and regardless of his citizenship or immigration status.  <u>See generally United States v. Olivares-Rangel</u>, 458 F.3d 1104, 1112 (10th Cir. 2006); <u>United States v. Shareef</u>, 100 F.3d 1491, 1500 (10th Cir. 1996).  It is the Government's burden to show that the warrantless seizure of Defendant's person was reasonable.  <u>See United States v. Maestas</u>, 2 F.3d 1485, 1491 (10th Cir. 1993).  If the Government cannot meet this burden, then the evidence obtained as a result of the seizure must be suppressed unless it was obtained by

---

[1]The Court uses the term "standing" as a convenient shorthand for referring to Defendant's reasonable expectation of privacy in the item or area that is the subject of the search or seizure he is challenging.  Although commonly used in this sense in many reported opinions, the common usage of the term "standing" in this context is technically incorrect because the matter is decided on the basis of substantive Fourth Amendment law rather than the jurisdictional requirements of Article III.  <u>See</u> <u>Rakas v. Illinois</u>, 439 U.S. 128, 139-40 (1978).  Thus, as a technical matter, the longer phrase, "reasonable expectation of privacy," can be substituted for the term "standing" wherever it appears in this *Memorandum Opinion and Order.*

"means sufficiently distinguishable to be purged of the primary taint" of the unlawful seizure.  Wong Sun v. United States, 371 U.S. 471, 487-88 (1963); see United States v. Erwin, 875 F.2d 268, 269 n.2 (10th Cir. 1989).

Defendant does not have Fourth Amendment standing, however, to challenge the search, seizure, or questioning of the other individual who opened the hotel-room door and initially spoke to the Border Patrol agents, because "[i]t is immaterial if evidence sought to be introduced against a defendant was obtained in violation of someone else's Fourth Amendment rights."  United States v. Arango, 912 F.2d 441, 445 (10th Cir.1990); accord United States v. Rascon, 922 F.2d 584, 586 (10th Cir. 1990).  In addition, there is a question as to whether this Defendant has a reasonable expectation of privacy in the hotel room that would allow him  to challenge the Border Patrol agent's entry into that room.  See United States v. Carr, 939 F.2d 1442, 1446 (10th Cir. 1991).

While it is possible that a motel room constitutes a temporary dwelling to which Fourth Amendment protections apply, see United States v. Wicks, 995 F.2d 964, 969 (10th Cir. 1993), it is Defendant's burden to "demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable; *i.e.*, one that has 'a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'"  Minnesota v. Carter, 525 U.S. 83, 89-90 (1998) (quoting Rakas, 439 U.S. at 143-144, and n. 12); see, e.g., Carr, 939 F.2d at 1444 (applying this test in the context of a motel-room search).

-17-

The Government eases Defendant's burden in this case by conceding in its supplemental brief that Defendant's "status as an overnight guest provides him a reasonable expectation of privacy in the hotel room." [Doc. 37, at 4-5.] I note, however, that the evidence of record provides very little factual support for this proposition, and it goes far beyond the written text of the Fourth Amendment to recognize a reasonable expectation of privacy in the tenuous situation presented here. See Carter, 525 U.S. at 97 (Scalia, J., concurring) ("Respondents here were not searched in 'their ... hous[e]' under any interpretation of the phrase that bears the remotest relationship to the well-understood meaning of the Fourth Amendment.").

In this regard, I find that Agent Guzman credibly testified that when the desk clerk showed him the registration record for the hotel room in question, it contained one first and last name only and no other information. No one testified that Defendant's name was on the registration card, and the other hotel occupant, Mr. Rodriguez, credibly testified that it was he who paid for the hotel room. Mr. Rodriguez's testimony does not indicate that he paid for the room at a double-occupancy rate or that Defendant would be staying with him for another night. Indeed, there is practically no explanation in the record of Defendant's relationship with Mr. Rodriguez at all, except for Mr. Rodriguez's testimony that Defendant was his "companion" and had stayed in the hotel room the night before.

The Government apparently relies on Mr. Rodriguez's testimony that Defendant had stayed with him at the hotel room the previous night as the basis for its concession that Defendant was an "overnight guest." But the "overnight guest" rule arose in the context of

guests who were invited to stay overnight in someone else's *house*, see Carter, 525 U.S. at

89, not the more transient context where a temporary guest of a hotel rents a room without

any plan to stay there in the future, and then a third party subsequently appears as a guest in

that room unbeknownst to the hotel staff for some unspecified period of time.  In the latter

context, the Tenth Circuit has been more reluctant to extend the "overnight guest" rule.  See

United States v. Gordon, 168 F.3d 1222, 1226-27 (10th Cir. 1999) (declining to extend a

reasonable expectation of privacy to a man occupying a motel room who was not the

registered guest of the hotel, even though he possessed a key to the room, gave $30.00 to

someone else to pay for the room, and men's clothing and toiletries were found in the room);

United States v. Conway, 73 F.3d 975, 979-80 (10th Cir. 1995) (declining to extend a

reasonable expectation of privacy to an unclothed man occupying a hotel room for purposes

of a sexual liaison, even though the man had a key and could identify the first name of the

registered guest, where the man's "personal, subjective expectation of privacy was unclear");

Carr, 939 F.2d at 1446 (declining to extend a reasonable expectation of privacy to a man who

presented an affidavit indicating he stayed in a motel room for about three weeks before his

arrest but did not testify at the suppression hearing or otherwise show any relationship with

a registered guest of the hotel).  I question whether these authorities are sufficient to bring

Defendant within the ambit of  the "overnight guest" rule, and I find that Defendant has

demonstrated neither a personal, subjective expectation of privacy in the hotel room at the

time Agent Guzman entered it, nor the factual predicates necessary to show that such an

expectation is reasonable under the circumstances.

-19-

Nevertheless, as a procedural matter, I accept the Government's concession that it is not challenging Defendant's Fourth Amendment standing in this case, and therefore I proceed with the remainder of my analysis under the legal fiction that Defendant was an "overnight guest" of the hotel at the time Agent Guzman entered the hotel room in question. Given that the Government was provided a full and fair opportunity to address this non-jurisdictional issue through supplemental briefing, I consider the Government to be bound by its tactical choice as to how to proceed, regardless of whether that choice is based on solid legal or factual grounds.  See Olivares-Rangel, 458 F.3d at 1106 n.1.

**B.     The Timing of the Seizure of Defendant's Person**

I next turn to the question of when the Border Patrol agents seized Defendant's person within the meaning of the Fourth Amendment.  The Supreme Court has defined a Fourth Amendment "seizure" as "an intentional acquisition of physical control."  Brower v. County of Inyo, 489 U.S. 593, 596 (1989).  Under this definition, a seizure can occur in either of two ways.  First, a seizure of a person may occur if there is a show of authority (such as verbal commands directed at a particular person or the flashing lights of a police car directed at another vehicle) followed by the targeted person's submission to that authority.  See California v. Hodari D., 499 U.S. 621, 626-27 (1991). Second, an intentional "application of physical force to restrain movement" of a person's body may constitute at least a momentary seizure of that person, even if he or she later escapes.  Id. at 626.

It does not follow, however, that a seizure within the meaning of the Fourth Amendment has occurred whenever there is a show of authority or an application of physical

force by a law enforcement officer.  If a show of authority does not cause the person at whom it is directed to stop and submit to that authority, then no seizure has occurred.  <u>See id.</u> at 628-29.  Further, an application of physical force to restrain the movement of a person's body must be "willful" and "intentionally applied" in order to constitute a seizure, <u>Brower</u>, 489 U.S. at 596-97, and a subsequent escape terminates such a seizure, <u>see</u> <u>Hodari D.</u>, 499 U.S. at 625.  Thus, even if Defendant was among the group of suspects that the Border Patrol agents were pursuing earlier that day and there had been some show of authority with respect to that group, Defendant was not seized at that time because the group did not submit to any show of authority and instead fled the scene.

A similar test applies to determine whether a person is "in custody" for purposes of triggering the requirement of administering <u>Miranda</u> warnings.  This requirement only applies when an individual is subject to "custodial interrogation."  <u>Miranda</u>, 384 U.S. at 439. "A person is not 'in custody' for Miranda purposes unless his 'freedom of action is curtailed to a degree associated with formal arrest.'"  <u>United States v. Rogers</u>, 391 F.3d 1165, 1169 (10th Cir. 2004) (quoting <u>Berkemer v. McCarty</u>, 468 U.S. 420, 440 (1984)).

In this case, defining the moment at which Defendant was seized and taken into custody depends largely on whether the Border Patrol agents' interaction with Defendant at the El Mirador hotel began as a consensual encounter rather than an investigative stop or an arrest.  <u>See generally</u> <u>Oliver v. Woods</u>, 209 F.3d 1179, 1186 (10th Cir. 2000).  A consensual encounter occurs when a law enforcement officer simply approaches a person to ask questions under circumstances where a reasonable person would feel free to refuse to answer

and end the encounter.  For example, officers generally may "go to a person's home to interview him," United States v. Daoust, 916 F.2d 757, 758 (1st Cir. 1990), because "[i]t is not improper for a police officer to call at a particular house and seek admission for the purpose of investigating a complaint or conducting other official business," 1 Wayne R. LaFave, Search and Seizure:  A Treatise on the Fourth Amendment §2.3(b), at 475 (3d ed. 1996).  Such encounters generally "are not seizures within the meaning of the Fourth Amendment, and need not be supported by suspicion of criminal wrongdoing."  Oliver, 209 F.3d at 1186.

Thus, in this case, there was nothing improper about the Border Patrol agent's initial efforts in seeking to interview the occupants of a particular hotel room at the El Mirador by briefly knocking on the door of that room.  Further, "a person standing in the doorway of a house [or hotel room] is 'in a "public" place,' and hence subject to arrest without a warrant permitting entry of the home [or room]." Illinois v. McArthur, 531 U.S. 326, 335 (2001) (quoting United States v. Santana, 427 U.S. 38, 42 (1976)); accord McKinnon v. Carr, 103 F.3d 934, 935 (10th Cir. 1996); see United States v. Vaneaton, 49 F.3d 1423, 1427  (9th Cir. 1995) (applying this rule to the doorway of a motel room).  Thus, the law does not recognize a reasonable expectation of privacy which would trigger the protections of the Fourth Amendment when Mr. Rodriguez voluntarily answered the door of the hotel room and stood at the open doorway during the initial consensual encounter with the Border Patrol agent. As noted above, Defendant does not have Fourth Amendment standing to challenge the other

hotel room occupant's arrest or his decision to engage the Border Patrol agents in a consensual encounter at the doorway.

The same rule may not apply, however, if Defendant himself was subjected to a show of official authority that would cause a reasonable person to believe he or she is not free to leave at that time,  see Florida v. Royer, 460 U.S. 491, 502 (1983) (plurality opinion), or if Defendant's exit from an area in which he has a reasonable expectation of privacy was caused by coercion or subterfuge on the part of the Border Patrol agents.  See United States v. Flowers, 336 F.3d 1222, 1226-28 (10th Cir. 2003); United States v. Maez, 872 F.2d 1444, 1451 (10th Cir. 1989).  In this regard,

> Courts have identified several factors that could lead a reasonable innocent person to believe that he is not free to disregard the police officer, including: the threatening presence of several officers; the brandishing of a weapon by an officer; some physical touching by an officer; use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; prolonged retention of a person's personal effects such as identification and plane or bus tickets; a request to accompany the officer to the station; interaction in a nonpublic place or a small, enclosed place; and absence of other members of the public.

United States v. Sanchez, 89 F.3d 715, 718 (10th Cir. 1996); accord United States v. Williams, 356 F.3d 1268, 1274 (10th Cir. 2004).

The determination of whether a person is in custody, and whether an encounter is no longer consensual, "is based on how a reasonable person would understand the situation." Rogers, 391 F.3d at 1169.  "This reasonable person 'does not have a guilty state of mind and does not have peculiar mental or emotional conditions that are not apparent to the questioning officer.'"  Id. (quoting United States v. Erving L., 147 F.3d 1240, 1247 (10th

Cir. 1998)); <u>see</u> <u>Williams</u>, 356 F.3d at 1275 (emphasizing that the "reasonable person" test presupposes an innocent person).  The subjective state of mind of the suspect or the officer "is wholly irrelevant and plays no role in [the Court's] evaluation of the circumstances surrounding the encounter."  <u>United States v. Abdenbi</u>, 361 F.3d 1282, 1292 (10th Cir. 2004).  Thus, it is a "critical error" for a district court to rely on such subjective impressions in determining whether an encounter between an officer and a suspect has become a "seizure" under the Fourth Amendment.  <u>See</u> <u>Rogers</u>, 391 F.3d at 1170.

In this case, my analysis of the factors outlined above leads to the conclusion that Defendant was not "seized" within the meaning of the Fourth Amendment, or "in custody" for <u>Miranda</u> purposes, until *after* he answered the Border Patrol agents' initial questioning about his immigration status and decided to exit the hotel room.  Before Defendant responded in this manner, the agents had not brandished any of their weapons, made physical contact with Defendant, retained any of his personal effects, issued any verbal commands to him, or engaged in any coercion or subterfuge directed at him.

In related contexts, the Supreme Court and the Tenth Circuit have rejected the proposition that the mere presence of one or more uniformed officers carrying holstered weapons is coercive *per se*.  <u>See</u> <u>United States v. Drayton</u>, 536 U.S. 194, 204-05 (2002); <u>Abdenbi</u>, 361 F.3d at 1288.  For similar reasons, I conclude that the mere presence of Agent Guzman in his Border Patrol uniform at the doorway of a hotel room that Mr. Rodriguez voluntarily opened without any coercion or subterfuge by the agents does not present a threat, or amount to a show of official authority, that would cause a reasonable innocent

person to believe that he is not free to leave the scene or otherwise go about his business inside the hotel room.

I also note that Agent Miranda remained further back from the doorway of the hotel room in the parking area where the Border Patrol vehicle was located, in order to keep watch on other suspects in custody inside that vehicle.  Hence, Agent Miranda presented no threat or coercive influence over Defendant when he made the decision to speak to Agent Guzman and exit the hotel room.

It is possible that, before turning his attention to questioning Defendant, Agent Guzman may have entered the hotel room for the purpose of checking if anyone was in the bathroom or closet.  It is also possible that given Defendant's own subjective knowledge of his immigration status, or the chase that ensued earlier in the day, he may have felt anxious or uneasy because of Agent Guzman's presence at the door or the agent's brief search of the room.  But Defendant's subjective state of mind is not relevant under the authorities cited above.  See Rogers, 391 F.3d at 1169-70; Abdenbi, 361 F.3d at 1292.  Moreover, the agent's brief search of the hotel room did not turn up any incriminating evidence which Defendant seeks to exclude in this case, and the agent did not address or contact Defendant in any way while in the room.  According to the scenario presented by Mr. Rodriguez's testimony, the agent's activities inside the hotel room were limited to checking the bathroom and then prompting Mr. Rodriguez to leave the room with the agent.

Neither Agent Guzman's brief search of the room nor his interactions with Mr. Rodriguez signaled that Defendant's freedom of action was curtailed to a degree associated

with a formal arrest.  At the time of the agent's questioning and even during the agent's brief search of the room, Defendant was still free to go about his business in the hotel room or elsewhere, and he had done nothing to submit to any show of authority by the agents.  <u>See</u> <u>Rogers</u>, 391 F.3d at 1170-71 (reasoning that a person may be confined to a certain area within his home without being placed under arrest); <u>Hodari D.</u>, 499 U.S. at 626-27 (reasoning that absent physical contact, no seizure occurs until the suspect actually submits to an officer's show of authority).  Thus, the agent's preliminary actions in knocking on the door of Mr. Rodriguez's hotel room, speaking with Mr. Rodriguez, briefly checking the room for other occupants, prompting Mr. Rodriguez to exit the hotel room with him, knocking on the door of another hotel room, returning to the open doorway of the hotel room that Defendant still occupied, and addressing Defendant for the first time from that open doorway did not constitute a seizure of Defendant within the meaning of the Fourth Amendment or <u>Miranda</u>.  It was not until after Defendant answered Agent Guzman's initial questioning and decided to exit the hotel room that he was "seized" within the meaning of the Fourth Amendment.

### C.    <u>The Justification for the Seizure of Defendant's Person</u>

The Tenth Circuit recently emphasized that a person's illegal presence within the United States does not automatically exempt the Border Patrol's seizure of that person from the usual requirements of the Fourth Amendment.  <u>See</u> <u>Olivares-Rangel</u>, 458 F.3d at 1112.  Instead, the Court applies the "normal and generally applicable" exceptions to the Fourth Amendment's warrant requirement to determine whether the warrantless seizure of

Defendant's person is justified as an investigative detention or a full custodial arrest.  Id.
Unlike the procedural posture of Olivares-Rangel, the Government has presented several
reasons why the warrantless seizure of Defendant is justified in this case.

Such a seizure may take the form of an investigative detention or a full custodial
arrest.  An investigative detention occurs when an officer stops and briefly detains a person
"'in order to determine his identity or to maintain the status quo momentarily while obtaining
more information.'"  Oliver, 209 F.3d at 1186 (quoting Adams v. Williams, 407 U.S. 143,
146 (1972)).  Inasmuch as such brief investigative detentions are not consensual, they
constitute a seizure and must meet two distinct requirements to be "reasonable" under the
Fourth Amendment.  First, the officer "'must have a particularized and objective basis for
suspecting the particular person stopped of criminal activity.'"  Id. (quoting United States v.
Cortez, 449 U.S. 411, 417-18 (1981)).  Second, the investigative detention that follows the
stop must be "reasonably related in scope to the circumstances" which justified the stop in
the first place, Terry v. Ohio, 392 U.S. 1, 20 (1968), because the Fourth Amendment imposes
"limitations on both the length of the detention and the manner in which it is carried out,"
United States v. Holt, 264 F.3d 1215, 1229 (10th Cir. 2001) (en banc).

The Supreme Court and the Tenth Circuit have articulated a series of factors for
evaluating the reasonableness of investigatory stops conducted by roving Border Patrol
agents.  See United States v. Brignoni-Ponce, 422 U.S. 873, 884-85 (1975); United States
v. Carrizales-Toledo, 454 F.3d 1142, 1147 (10th Cir. 2006).  While many of these factors
relate to investigative stops of vehicular traffic, the premise underlying each factor is that

Border Patrol agents have a "special function" in enforcing the nation's immigration laws by detaining persons who are present in the United States illegally and in proximity to the border. Brignoni-Ponce, 422 U.S. at 883; see United States v. Cabrera, 119 F.3d 1454, 1459 (10th Cir. 1997). Thus, in this context it is permissible for Border Patrol agents to focus their suspicions on a person's immigration status even if that person is not involved in any other form of criminal activity at the time.

From the time they first approached the door of the hotel room Defendant was occupying, I conclude that the Border Patrol agents in this case had reasonable suspicion to conduct an investigative detention of the occupants of that hotel room based on the agents' knowledge concerning the traffic patterns of undocumented aliens in the City of Deming, the city's proximity to the border, the agents' experience chasing the group of suspects a few blocks from the El Mirador hotel earlier in the day, and their knowledge of the particular hotel room Defendant was occupying (including its past usage as a way station for undocumented aliens and the incomplete registration card supplied by the desk clerk). These suspicions were confirmed, and not dispelled, during the consensual encounter with the hotel-room occupants, when Mr. Rodriguez opened the door, thereby revealing that the room was occupied, and responded in a manner that suggested he was in the United States unlawfully. Thus, even if Defendant was subject to an investigative detention for a brief period after the agents arrived at the door to the hotel room, such a brief detention was justified by a reasonable suspicion that he also was in the United States unlawfully.

-28-

Further analysis is required to determine whether the Border Patrol agents were justified in taking Defendant into custody and placing him in their vehicle with the other suspects after he answered Agent Guzman's initial questioning and decided to exit the hotel room.  Since the agents did not release Defendant from their Border Patrol vehicle, but instead took him to the Border Patrol station, the seizure eventually exceeded the limited scope and duration of an investigative detention.

A seizure that exceeds the limited scope or duration of an investigative detention may nevertheless be justified as an arrest.  An arrest is a seizure that is "'characterized by highly intrusive or lengthy search or detention.'"  Oliver, 209 F.3d at 1186 (quoting United States v. Cooper, 733 F.2d 1360, 1363 (10th Cir. 1984)).  The general rule is that "the use of firearms, handcuffs, and other forceful techniques" is sufficiently intrusive to signal that a person has been placed under arrest.  United States v. Melendez-Garcia, 28 F.3d 1046, 1052-53 (10th Cir. 1994); accord Royer, 460 U.S. at 499.

As noted above, the agents did not apply such forceful techniques to Defendant's person until *after* he responded to Agent Guzman's initial questioning, failed to provide any documentation of his identity or immigration status, and exited the hotel room.  Thus, Defendant was not subjected to a full custodial arrest until after those events occurred.

Inasmuch as an arrest exceeds the limited scope or duration of an investigative stop, it must be supported by probable cause.  "Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed

-29-

or is committing an offense." Romero v. Fay, 45 F.3d 1472, 1476 (10th Cir. 1995).  This standard does not, however, "'require the same type of specific evidence of each element of the offense as would be needed to support a conviction.'" United States v. Pollack, 895 F.2d 686, 691 (10th Cir. 1990) (quoting Adams, 407 U.S. at 148-49).  Indeed, "[t]he fact that the police did not, at the time of arrest, know exactly what crime had occurred is not relevant, so long as they had probable cause to believe 'an offense' had been committed." United States v. Edwards, 242 F.3d 928, 935 (10th Cir. 2001) (quoting United States v. Maher, 919 F.2d 1482, 1485 (10th Cir. 1990)).

Reviewing courts "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing.  This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" United States v. Arvizu, 534 U.S. 266, 273 (2002) (quoting Cortez, 449 U.S. at 417-18).  "As the phrase suggests, a 'totality of the circumstances' test does not depend on whether any particular factor is innocent when considered in isolation, but on whether, taken as a whole, the facts observed by the law enforcement officers indicate a fair probability that" the Defendant is engaged in illegal activity.  United States v. Ledesma, 447  F.3d 1307, 1316 (10th Cir. 2006).

The offense in question here is Defendant's unlawful presence in the United States.  Under the statutory regime articulated in Brignoni-Ponce and its progeny, the Border Patrol agents were authorized to detain Defendant based on probable cause to believe that he was

in the United States illegally, even if they did not yet know of his prior felony conviction. And the Border Patrol agents had probable cause to believe that Defendant committed such an immigration offense because, in addition to the surrounding circumstances previously recited in support of the finding of reasonable suspicion, Defendant readily admitted to the agent that he was in the United States illegally and did not present any documentation to show otherwise.

This admission occurred in response to the agent's questioning from the open doorway, which preceded both Defendant's exit from the hotel room and his arrest. Before exiting the hotel room, Defendant remained unrestrained and, according to Mr. Rodriguez's testimony, was in the process of putting his shirt and shoes on. Neither the testimony of Mr. Rodriguez nor that of Agent Guzman provides credible support for an inference that the agent arrested Defendant from within the hotel room or coerced him to exit the room under circumstances analogous to those present in Flowers, 336 F.3d at 1226-28, or Maez, 872 F.2d at 1451. Therefore, the showing of probable cause alone suffices to justify the warrantless arrest of Defendant outside the hotel room.

In order to provide a complete record and facilitate appellate review, I will briefly address the legal consequences of the alternative hypothesis that Defendant's arrest occurred within the privacy of a hotel room, even though I find no factual support for that hypothesis. A warrantless arrest inside a hotel room may require something more than just a showing of probable cause if the arrestee has demonstrated a reasonable expectation of privacy in that location. See Wicks, 995 F.2d at 969. Although I find very little factual support or legal

authority for the proposition that Defendant had such a reasonable expectation of privacy in the hotel room at the time of his encounter with the Border Patrol agents on the afternoon of April 23, 2006, the Government has made the tactical choice to accept this proposition. [Doc. 37, at 4-5.]

Assuming that Defendant's arrest occurred inside the hotel room and that he had a reasonable expectation of privacy in that location at the time of the arrest, the Government must supplement its showing of probable cause with "a plausible claim of specially pressing or urgent law enforcement need, *i.e.*, 'exigent circumstances.'" McArthur, 531 U.S. at 331. "The notion that emergency circumstances may in appropriate cases make a warrantless search constitutional if probable cause exists is a clearly established exception to the warrant requirement." United States v. Aquino, 836 F.2d 1268, 1270-71 (10th Cir. 1988); accord United States v. Cuaron, 700 F. 2d 582, 586 (10th Cir. 1983). In addition to circumstances like McArthur where the destruction of particular evidence is imminent, the Tenth Circuit has applied this exception to "'hot pursuit of a fleeing felon . . . or the need to prevent a suspect's escape, or the risk of danger to the police or to other persons inside or outside the dwelling.'" Wicks, 995 F. 2d at 970 (quoting Minnesota v. Olson, 495 U.S. 91, 100 (1990) (citations omitted)); see, e.g., United States v. Famiglietta, 164 Fed. Appx. 695 (10th Cir. 2006) (unpublished disposition).

The Tenth Circuit has previously applied the "exigent circumstances" exception to a warrantless arrest in a motel room. See Wicks, 995 F.2d at 970-71; Carr, 939 F.2d at 1446. The exigency at issue here is the likelihood that Defendant (or other occupants of the hotel

room) will flee the scene and evade capture by the Border Patrol agents, as several members of the group of people the agents observed earlier in the day had already done when they saw the Border Patrol vehicle approaching them.  Further, the agents' prior experience with this particular hotel room indicated that it was frequently used by transient undocumented aliens on a short-term basis, and there was a ladder nearby to facilitate quick and secretive egress from the room, even when the hotel is under surveillance from the parking lot or main street in front of it.

Defendant asserts that the likelihood of an escape presented by these circumstances does not constitute the type of exigency that qualifies for an exception to the Fourth Amendment's warrant requirement because the immigration offenses committed by the potential escapees are not serious or violent crimes.   I disagree with this assertion in the special context presented here.  While some other law-enforcement agencies further away from the border may consider immigration offenses to be a low priority that does not warrant their attention, Congress has made it the statutory mission of the United States Border Patrol to pursue and apprehend individuals suspected of being in the United States unlawfully.  The United States Supreme Court recognized the importance of the Border Patrol's statutory mission when it addressed the constitutionality of roving patrols in proximity to the border in Brignoni-Ponce, 422 U.S. at 883.  See Cabrera, 119 F.3d at 1459.

Deming, New Mexico is located approximately 35 miles from the border with Mexico and experiences a high volume of illegal border traffic.  Thus, in the special context presented here, I conclude that the immigration offenses the hotel occupants were suspected

of committing are serious enough to provide a lawful basis for the Border Patrol agent's invocation of the "exigent circumstances" exception to the warrant requirement.

Under the circumstances presented here, and giving due deference to the Border Patrol agents' training and experience, it would ignore the realities of the situation to require the agents to wait for the opportunity to apply for a search warrant for the hotel room before proceeding to knock on the door and find out if the room was occupied at the time they were investigating or pursuing the crowd of suspects that ran from the Border Patrol vehicle earlier in the day.  And once they knocked on the door and thereby established probable cause to believe that the room was in fact occupied by persons unlawfully in the United States, the agents could not leave the entrance to the hotel room because to do so would give the suspects a clear path of escape through the courtyard area to the ladder leading over the wall. With respect to the likelihood of such an escape, it is important to note that Defendant and Mr. Rodriguez have shown no ties to the Deming area, and Mr. Rodriguez testified that he was not planning to stay in Deming on the date in question.

As shown by the facts of this case and other reported opinions arising from this district, border traffic in the southern reaches of New Mexico presents a very fluid and rapidly changing situation, where Border Patrol agents must act quickly to detain very large numbers of persons crossing the border illegally on a daily basis.  It is not reasonable to expect the Border Patrol to use its limited manpower to post guard around the entire perimeter of a hotel while awaiting a warrant to arrive, when there are numerous other suspects trying to evade capture in the same general area at the same time, and the agents

also must keep watch over the suspects they have previously taken into custody and who are awaiting transport to the Border Patrol station.  For these reasons, I find that this situation presents exigent circumstances which justify an immediate entry through the open hotel-room door.

This finding does not, however, imply that the Border Patrol agents would be justified in deliberately creating an exigency themselves as a ruse to avoid the need for obtaining a warrant, especially when they are able to establish probable cause well in advance of any realistic danger that a suspect will flee or destroy evidence.  See Wicks, 995 F.2d at 970.  But that is not the case here, because the agents were already facing an exigent situation when a large group of people fled from their marked Border Patrol vehicle in all directions earlier that day, and the agents did not have an expeditious way to confirm the hotel clerk's information that the room in question was in fact occupied at the time other than by knocking.  See United States v. Jones, 239 F.3d 716 (5th Cir. 2001) (concluding that there was no deliberate creation of exigency where agents did not have enough information to establish probable cause before knocking); United States v. Grissett, 925 F.2d 776, 778 (4th Cir. 1991) (similar).

I also emphasize that the Border Patrol agents in this case were not exploiting their statutory authority to pursue illegal border traffic as a means to investigate other crimes that fall outside of their statutory mission.  Rather, the Border Patrol agents were working within their normal duties in patrolling for such traffic within 35 miles of the border and did not expand the scope of their work into a more generalized search of the hotel.  For these

reasons, I conclude that the warrantless seizure of Defendant's person did not violate the Fourth Amendment even if that seizure required a showing of exigent circumstances to enter the hotel room.

### D.   The "Fruit of the Poisonous Tree" Doctrine

Because I conclude that the warrantless seizure of Defendant's person did not violate the Fourth Amendment, and his response to the Border Patrol agents' initial questioning before this seizure was not taken in violation of the requirements of Miranda, it follows that Defendant may not rely on the "fruit of the poisonous tree" doctrine as a basis for suppressing any evidence or statements obtained as a result of these actions.  "A party seeking exclusion of evidence on Fourth Amendment grounds must demonstrate both actual police misconduct that violated the defendant's Fourth Amendment rights, and that the evidence to be excluded was in fact a product of the police misconduct." Williams, 356 F.3d at 1272 (citing United States v. DeLuca, 269 F.3d 1128, 1132 (10th Cir.2001) and United States v. Nava-Ramirez, 210 F.3d 1128, 1131 (10th Cir.2000)).  "'Only if the defendant has made these two showings must the government prove that the evidence sought to be suppressed is not "fruit of the poisonous tree," either by demonstrating the evidence would have been inevitably discovered, was discovered through independent means, or was so attenuated from the illegality as to dissipate the  taint of the unlawful conduct.'" DeLuca, 269 F.3d at 1132 (quoting Nava-Ramirez, 210 F.3d at 1131) (citations omitted).  See Williams, 356 F.3d at 1273 (citing Wong Sun, 371 U.S. at 487-88).  Similar requirements

apply to invoke the exclusionary rule with respect to <u>Miranda</u> violations.   <u>See, e.g.</u>, <u>Carrizales-Toledo</u>, 454 F.3d at 1149-53.

In this case, I conclude that Defendant has failed to make either of the two showings required to invoke the "fruit of the poisonous tree" doctrine.  I further conclude that even if Defendant's response to the agents' initial question about his immigration status, as well as any evidence found inside the hotel room, were to be suppressed under the exclusionary rule, the agents' decision to detain Defendant and take him to the Border Patrol station for processing did not result from his utterance of that statement or any evidence found in the hotel room.  Rather, the evidence of Defendant's identity obtained from the Border Patrol's fingerprint analysis was discovered through independent  means by other agents as part of a standard booking procedure, and the agents who performed this procedure did not know of the details of this particular Defendant's arrest or any evidence found in the hotel room.   <u>See</u> <u>Olivares-Rangel</u>, 458 F.3d at 1113 (remanding for determination of whether fingerprint evidence was tainted by an illegal arrest and custodial interrogation).

"The government always has the right, and indeed the obligation, to know who it is that they hold in custody regardless of whether the arrest is later determined to be illegal." <u>Id.</u>   In this case, the agents credibly testified that they turned Defendant and the other suspects over to processing agents who did not know the details of each particular suspect's arrest and, therefore, could not rely on those suspects' prior oral statements to determine their identity or citizenship.  And regardless of whether Defendant made any oral statements to the Border Patrol agents in this case, the agents still had reasonable suspicion to detain

him for a brief period in order to determine whether he could produce any reliable documentation of his identity or immigration status.  Finding none, the agents then would have been justified in turning Defendant over to the processing agents for fingerprinting as part of a standard booking procedure to determine the identity of the person in their custody.

Subjecting undocumented persons to such a standard identification procedure in this case was not an exploitation of any illegality in questioning Defendant without <u>Miranda</u> warnings, seizing Defendant's person without a warrant, or searching the hotel room.  In particular, the agent's actions in knocking on the hotel room door and questioning the occupants was not a ruse or subterfuge designed for the purpose of obtaining Defendant's fingerprints without a warrant or probable cause.  <u>See</u> <u>id.</u> at 1115-16.  Rather, the agents were responding to an exigent situation not of their own making, which began earlier in the day when a large group of people suspected of being in the United States illegally ran away as the agents' Border Patrol vehicle approached them.

## III.   <u>CONCLUSION</u>

For the foregoing reasons, I conclude that the Border Patrol agents' seizure of Defendant was not unreasonable within the meaning of the Fourth Amendment, and Defendant's response to the agent's initial questioning before this seizure was not taken in violation of the requirements of <u>Miranda</u>.  There is no basis for excluding any evidence or statements which led the agents to discover that Defendant has a prior felony conviction and is present in the United States illegally.

**IT IS, THEREFORE, ORDERED** that Defendant Jaime Portillo-Portillo's *Motion*

*to Suppress Evidence and Statements* [Doc. 22] is **DENIED**.

**SO ORDERED** this 23rd day of October, 2006, in Albuquerque, New Mexico.

_____
**M. CHRISTINA ARMIJO**
United States District Judge